1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                   **CENTRAL DISTRICT OF CALIFORNIA**

10

11  TRAVIS WILLIAM SUITER,                Case No. CV 12-11053 SS

12                  Plaintiff,

13         v.
                                          **MEMORANDUM DECISION AND ORDER**
14  CAROLYN W. COLVIN, Commissioner
    of the Social Security
15  Administration

16                  Defendant.

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.

## INTRODUCTION

Travis William Suiter ("Plaintiff") seeks review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner" or the "Agency") denying him Disability Insurance Benefits and Supplemental Security Income. The parties consented, pursuant to 28 U.S.C. § 636(c), to the jurisdiction of the undersigned United States Magistrate Judge. (Dkt. Nos. 11 & 12).  For the reasons stated below, the decision of the Commissioner is AFFIRMED.

# II.

## PROCEDURAL HISTORY

Plaintiff Travis William Suiter applied for Title II Disability Insurance Benefits ("DIB") and Title XVI Supplemental Security Income ("SSI") on April 10, 2007.  (Administrative Record ("AR") 107-14).  In both applications, Plaintiff alleged a disability onset date of December 31, 2003.  (AR 109).  The Agency initially denied Plaintiff's applications on August 31, 2007.  (AR 60-61, 64-68).  Plaintiff requested reconsideration on September 24, 2007, (AR 69), and the Agency denied his claims again on December 10, 2007.  (AR 62-63, 70-79).  Thereafter, Plaintiff filed a Request for Hearing by Administrative Law Judge on January 29, 2008.  (AR 80-81).  Plaintiff testified before the ALJ on October 21, 2008 and January 12, 2009.  (AR 22-59).  The ALJ subsequently denied Plaintiff's applications on September 8,

2009.   (AR 9-21).   On November 12, 2009, Plaintiff requested review of the ALJ's decision.   (AR 6-8).   The Agency denied Plaintiff's request on May 18, 2010, (AR 1-3), and Plaintiff filed an action in this Court on July 22, 2010 seeking review of the Agency's non-disability determination.   (AR 467).

On July 28, 2011, this Court reversed the ALJ's decision and remanded Plaintiff's case for further proceedings.   (AR 464).   Specifically, the Court found that the ALJ (1) improperly rejected the medical opinions of Plaintiff's treating physician Dr. Mehri McKellar, (2) failed to provide clear and convincing reasons for rejecting Plaintiff's credibility, (3) failed to consider the combined effects of Plaintiff's impairments when determining his residual function capacity ("RFC"), and (4) erred by finding Plaintiff's depression "non-severe" at step two of the five-step inquiry that the ALJ must undertake.   (AR 471-82).

On September 26, 2011, the Appeals Council issued an order vacating the ALJ's September 8, 2009 decision and remanding the case for further proceedings consistent with the district court's Order.   (AR 459-63).   Plaintiff testified before the ALJ on October 4, 2012, (AR 437-58), and the ALJ denied Plaintiff's applications, for a second time, on October 24, 2012.   (AR 413-33).   Plaintiff filed the instant action on January 8, 2013.

\\
\\
\\
\\

3

III.

**FACTUAL BACKGROUND**

Plaintiff was born on December 28, 1972.  (AR 179).  He was thirty-one years old on the date that he allegedly became disabled and thirty-nine years old at the time of his most recent hearing before the ALJ.  Plaintiff graduated from high school and completed approximately two years of college.  (AR 453).  Plaintiff alleged that could not engage in substantial gainful activity after December 31, 2003 due to his HIV, neurosyphilis, hearing problems and depression.  (AR 12).  Plaintiff also claimed that since 2006, he had experienced "severe headaches and complications from [] neurosyphilis" that prevented him from working.  (AR 24-25).  Other conditions that allegedly interfered with Plaintiff's ability to engage in substantial gainful employment include chronic diarrhea, nausea, fatigue and bipolar disorder.  (AR 25, 52, 440, 442).

**A.   Medical History and Treating Doctors' Opinions**

**1.   Physical and Mental Condition**

Plaintiff was diagnosed with HIV in 1997.  (AR 17, 293, 647).  From July 2000 to September 2004, Plaintiff was a regular patient at Denver Health Medical Center ("DHMC"), where he underwent HIV-related treatment and testing.  (AR 183-227).  It appears that Plaintiff actively used crystal methamphetamine throughout 2004.  (AR 188-89, 194, 197).  Although Plaintiff's

4

1  medical records from DHMC are predominantly handwritten and

2  somewhat difficult to understand, there is no indication that

3  Plaintiff suffered from neurosyphilis, severe headaches, hearing

4  loss, or any chronic physical condition other than HIV between

5  July 2000 and September 2004.  Indeed, when Plaintiff left the

6  care of his primary physician at DHMC, Dr. Jeff Logan, his immune

7  status was "acceptable" with a CD4 count of 430 and an HIV viral

8  load of 2,350.  (AR 261).  Furthermore, Plaintiff was not taking

9  medication to control his HIV and was not "suffering from any

10 functional limitations."  (Id.).

11

12    In 2006, Plaintiff began to frequently visit the AIDS Health

13 Foundation Clinic ("AHF") in Hollywood, CA.  (AR 241).  In June

14 2006, an AHF nurse practitioner referred Plaintiff to clinical

15 audiologist Susan J. Frugone, who performed audiological tests on

16 Plaintiff on June 12, 2006.  (AR 765).  Ms. Frugone concluded

17 that Plaintiff suffered from asymmetric sensorineural hearing

18 loss, mild high frequency loss in the left ear and profound to

19 moderate loss in the right ear.  (Id.).  Plaintiff's speech

20 recognition scores were also asymmetric (poor in the right ear

21 and excellent in the left ear).  (Id.).  Ms. Frugone did not

22 recommend amplification (i.e., a hearing aid) for Plaintiff's

23 right ear due to his "poor speech discrimination score on the

24 right."  (Id.).

25

26    On June 13, 2006, Plaintiff visited AHF and reported feeling

27 "run down" and "stressed."  (AR 241).  Plaintiff's medical chart

28 reflected his history of HIV, anxiety, depression, syphilis and

hearing loss.  (Id.).  At the time of his visit, Plaintiff did not report severe headaches.  (Id.).  He appeared well-nourished and well-developed, and he registered a Karnofsky Score of 90, which indicated that he was able to carry out normal activity.  (AR 242).

On February 23, 2007, Plaintiff underwent a follow-up examination at AHF.  (AR 244-47).  Plaintiff reported feeling sick for over a week, as well as severe headaches, a sore throat and sinus issues.  (AR 244).  He also admitted to methamphetamine use.  (Id.).  Nevertheless, Plaintiff's Karnofsky Score remained a 90.  Plaintiff was prescribed amoxicillin for possible sinusitis, but was not prescribed any medication for his headaches.  (Id.).

On March 19, 2007, Plaintiff visited AHF for a routine examination.  (AR 248-51).  Plaintiff expressed concern that he had contracted neurosyphilis.  (AR 248).  He also stated that he was suffering from painful headaches.  (AR 249).  Although Plaintiff's HIV viral load had climbed to 10,000, he was not taking medication to control his HIV, and he remained generally asymptomatic and able to function normally.  (AR 248-49).

On April 10 2007, Plaintiff's treating physician at AHF, Dr. Mehri McKellar, diagnosed Plaintiff with neurosyphilis.  (AR 236-38).  (AR 293-97).  However, Dr. McKellar found that Plaintiff was not markedly restricted in his ability to engage in daily activities or function socially.  (AR 238).  Similarly, Plaintiff

1   faced no marked difficulty in timely completing tasks due to

2   deficiencies in concentration, persistence, or pace.  (Id.).

3

4       Dr. McKellar subsequently examined Plaintiff on May 11,

5   2007.  Plaintiff reported ringing in his ears, headaches and

6   depression.  (AR 293).  Dr. McKellar's notes indicated that

7   Plaintiff was taking Ibuprofen and Midrin for his headaches.  (AR

8   294).

9

10      On November 1, 2007, Plaintiff visited AHF complaining of

11  acute diarrhea lasting three to four days.  (AR 298).  Plaintiff

12  denied nausea, vomiting, fever, chills, or blood in his stool.

13  (Id.).  He reported no pain, denied fatigue and remained capable

14  of normal activity.  (AR 293-300).  Plaintiff was prescribed

15  Flagyl and Lomotil for his diarrhea and received re-fills for his

16  Midrin and Ibuprofen prescriptions.  (AR 301-02).

17

18      On November 7, 2007, Dr. McKellar completed a physician

19  statement section of an HIV Questionnaire setting forth his

20  opinion regarding Plaintiff's capacity to work.  (AR 156-57).

21  Although Dr. McKellar stated that Plaintiff was chronically ill

22  and visibly fatigued due to his chronic headaches, low CD4 count,

23  diarrhea, depression and hearing loss, he nevertheless concluded

24  that Plaintiff was able to lift twenty pounds for two hours per

25  day, lift ten pounds for six hours per day, walk for two to four

26  hours per day, and sit for unlimited periods of time.  (Id.).

27  \\

28  \\

7

1    On November 21, 2007, Plaintiff returned to AHF for a
2  follow-up appointment with Dr. McKellar.   Dr. McKellar noted
3  Plaintiff's chronic "tension headaches," but found that Plaintiff
4  was still able to carry out normal activity.  (AR 304, 306).   On
5  December 20, 2007, Dr. McKellar examined Plaintiff, who
6  complained of a cough, nasal congestion and headaches.  (AR 309-
7  313).   By April 2008, Dr. McKellar reported that Plaintiff was
8  taking antitretroviral medications to mitigate the effects of his
9  HIV.  (AR 346).

10

11    From January 25, 2007 to November 7, 2008, it appears that
12  Plaintiff received treatment from a chiropractor for, inter alia,
13  his chronic headaches.  (AR 318-412).   As part of this treatment,
14  Plaintiff filled out a Headache History form detailing the nature
15  and frequency of his headaches.  (AR 411).   Plaintiff indicated
16  that his headaches occurred daily and typically interfered with
17  his ability to function at home "at the end of the day[.]"   (AR
18  412).   He also stated that his headaches generally manifested in
19  the "late afternoon."  (Id.).

20

21    After 2007, Plaintiff continued to receive routine treatment
22  for his HIV from Dr. Thomas Biddison at the Los Angeles Gay &
23  Lesbian Center.  (AR 341-44, 616-717).   On September 22, 2008,
24  Dr. Biddison completed a form entitled "Medical Opinion Re:
25  Ability to Do Work-Related Activities (Physical)" in which he
26  opined regarding Plaintiff's work-related limitations.  (AR 385-
27  87).   Dr. Biddison concluded that Plaintiff could occasionally
28  lift and carry fifty pounds, frequently lift and carry twenty-

1   five pounds, and sit without limitation.  (AR 385).  Plaintiff

2   was able to twist, stoop, crouch, bend and climb without

3   limitation.  (AR 386).  He could also reach, feel, engage in fine

4   and gross manipulation and push and pull without limitation.

5   (Id.).  However, Dr. Biddison determined that Plaintiff should

6   avoid prolonged exposure to humidity, fumes, odors, dusts, gases

7   and poor ventilation due to his chronic sinusitis.  (AR 387).

8   Aside from this limitation, Plaintiff was able to work in all

9   other environments, including noisy environments.  (Id.).

10

11       After 2008, Plaintiff continued to receive treatment at AHF

12   for conditions including "whooshing" eye movements, oral thrush,

13   various skin problems and tinnitus.  (AR 421) (citing AR 751-64,

14   768-801).   On June 30, 2011, Plaintiff returned to AHF

15   complaining of, inter alia, hearing loss and chronic headaches.

16   (AR 755).   However, during an August 23, 2011 examination,

17   Plaintiff denied experiencing headaches.  (AR 782).  Similarly,

18   during a December 7, 2011 neurology examination performed by Dr.

19   Miguel Valdes-Sueiras at AHF, Plaintiff reported no headache pain

20   and claimed that his headaches had mostly "resolved."  (AR 773).

21   \\

22   \\

23   \\

24   \\

25   \\

26   \\

27   \\

28   \\

**B.**   **Examining and Non-Examining Consultative Doctors' Opinions**

    **1.**   **Physical Condition**

        a.   Dr. Bryan H. To

On June 27, 2007, examining physician Dr. Bryan H. To provided the Agency a summary report of an independent internal medicine evaluation of Plaintiff performed at S&L Medical Group in Echo Park, CA. (AR 262-66). Dr. To found that Plaintiff had a grip strength of fifty-five pounds in both hands, appeared neat and clean, ambulated with a normal gait and required no assistance to walk. (AR 263). Plaintiff's hearing "appear[ed] to be adequate" and his muscle tone and mass were normal. (AR 264). Plaintiff was oriented to time, place, person and purpose. (AR 265). His memory was intact and he displayed no problem with coordination, motor function, or motor strength. (Id.).

Based on his examination of Plaintiff, Dr. To concluded that Plaintiff could occasionally push, pull, lift and carry fifty pounds; frequently push, pull, lift and carry twenty-five pounds; stand and walk for six hours per day; and sit without limitation. (Id.). Plaintiff could walk on uneven terrain, climb ladders and work at heights frequently. (Id.). He could use his hands for fine and gross manipulation and was able to bend, kneel, stoop, crawl and crouch frequently. (AR 266). Dr. To concluded that Plaintiff experienced no hearing and seeing limitations, but could not work with heavy or moving machinery. (Id.).

1          b.   Dr. Padma A. Talcherkar

2

3      On November 14, 2007, non-examining physician Dr. Padma A.

4 Talcherkar completed a physical RFC assessment for the Agency

5 based on her review of Plaintiff's medical records.  (AR 287-92).

6 Dr. Talcherkar concluded that Plaintiff could occasionally lift

7 and carry fifty pounds, frequently lift and carry twenty-five

8 pounds, stand and walk for six hours per day, sit for six hours

9 per day, and push and pull without limitation.   (AR 288).

10 Plaintiff faced no limitations reaching, handling, feeling,

11 communicating, seeing, hearing or working in different

12 environments.   (AR 289-90).   Although Dr. Talcherkar found

13 evidentiary support for Plaintiff's claims regarding the nature

14 of his symptoms, she concluded that Plaintiff's "contentions

15 regarding the severity of, and the related functional

16 restrictions are not supported."  (AR 291).   For example, Dr.

17 Talcherkar found that Plaintiff's ability to hear and understand

18 her without the use of an amplification device during their phone

19 conversations contradicted the purported severity of his hearing

20 loss.  (AR 291-92).

21

22          c.   Dr. Azizollah Karamlou

23

24      On October 6, 2011, examining physician Dr. Azizollah

25 Karamlou submitted a summary report of an internal medicine

26 consultation of Plaintiff performed at S&L Medical Group in Los

27 \\

28 \\

11

Angeles, CA.[1]   (AR 726-29).   During the consultation, Plaintiff appeared well-developed and well-nourished.   (AR 727).   He was not under any acute distress, and he was able to generate sixty-five pounds of force using his right hand and thirty pounds of force using his left hand.   (Id.).   Although Plaintiff experienced decreased hearing acuity in his right ear, his hearing in his left ear was "within normal limits."   (Id.). Based on the foregoing, Dr. Karamlou concluded that Plaintiff experienced "no restrictions with standing, walking, bending, lifting or carrying."   (AR 729)   Furthermore, he had no difficulty with gross or fine hand manipulation.   (Id.). (AR 729).

### d.   Dr. Nancy Armstrong

On September 29, 2011, non-examining physician Dr. Nancy Armstrong completed a RFC physical assessment of Plaintiff based on her review of his medical records.   Dr. Armstrong concluded that Plaintiff could occasionally lift and carry ten pounds, frequently lift and carry less than ten pounds, stand and walk for two hours per day, sit for six hours per day, and push and pull without limitation.   (AR 746).   Plaintiff could occasionally climb, balance, stoop, kneel, crouch and crawl.   (AR 747).

---

[1]   The Administrative Record also contains a December 15, 2009 summary report of an internal medicine consultation performed at S&L Medical Group in Echo Park, CA.   (AR 613-15).   However, this report does not identify the physician who examined Plaintiff. Moreover, the report lacks any conclusions regarding Plaintiff's physical limitations, if any.   Accordingly, the Court has omitted a discussion of this report's contents.

Plaintiff could engage in fine and gross manipulation and feel without limitation, but could reach overhead on a limited basis only.  (Id.).  Dr. Armstrong found that Plaintiff could see, hear and communicate without limitation.  (AR 747-48).  However, he should avoid working in environments with excessive noise, fumes, odors, dusts, gases, or poor ventilation.  (AR 748).

### 2.   Mental Condition

#### a.   Dr. Steven J. Brawer

On November 7, 2007, examining physician Dr. Steven J. Brawer provided the Agency a summary report of a psychological evaluation of Plaintiff conducted at S&L Medical Group in Echo Park, CA.  (AR 279-84).  Dr. Brawer described Plaintiff as somber, responsive, receptive, expressive, compliant in performing various tasks and adequately motivated.  (AR 279). Plaintiff denied suicidal ideation and explained that he could not obtain employment because of his hearing loss, headaches, diarrhea and feeling of hopelessness.  (AR 280).  Plaintiff denied any past or present use of street drugs.  (AR 281).

Dr. Brawer observed that Plaintiff successfully completed memory tests and his remote memory appeared grossly intact.  (AR 282).  Plaintiff "demonstrated an adequate attention span for answering interview questions and following test instructions. During performance tasks, [he] was able to sustain concentration and work without distraction."  (Id.).  Plaintiff yielded a Full

Scale IQ score of 88, placing him in the Low Average Range of general intelligence.  (AR 282).

Based on the foregoing, Dr. Bawer concluded that Plaintiff had the capacity to learn simple repetitive tasks and could perform detailed varied or complex tasks.  (AR 283).  Plaintiff's capacity for extended periods of sustained concentration and attention "may [have been] mildly diminished, primarily due to emotional factors."  (Id.).  However, during testing, Plaintiff "demonstrated adequate attention, concentration, persistence and pace in completing tasks."  (Id.).  Plaintiff also displayed symptoms of anxiety and depression, which could adversely impact his ability to deal with ordinary work stresses.  (Id.). Accordingly, Dr. Brawer opined that Plaintiff might "function most optimally in a semi-isolated work setting" despite his general ability to relate appropriately with supervisory authority figures.  (AR 284).

        b.   Dr. Melvin D. Morgan

        On December 7, 2007, non-examining physician Dr. Melvin D. Morgan completed a mental RFC assessment of Plaintiff based on his review of Plaintiff's medical records.  (AR 338-40).  Dr. Morgan concluded that Plaintiff was not significantly limited in his ability to remember locations and work-like procedures or understand and remember even detailed work instructions.  (AR 338).  Similarly, Plaintiff could carry out simple and detailed instructions, maintain concentration and attention for extended

periods, perform activities within a fixed schedule, sustain a routine, and work with or in proximity to others without being distracted by them. (Id.). Although Plaintiff was moderately limited in his ability to interact appropriately with the public and work without taking unreasonable rest periods, he was able to interact socially and adapt to his work environment. (AR 339). In sum, Dr. Morgan opined that Plaintiff could "sustain adequate pace and persistence" and "adapt and relate to coworkers and supervisors." (AR 340). However, Plaintiff would be most effective in a setting involving limited contact with the public. (Id.).

### c.   Dr. Ernest A. Bagner III

On August 23, 2011, examining physician Dr. Ernest A. Bagner III provided the Agency with a summary report of a complete psychiatric evaluation of Plaintiff performed at S&L Medical Group in Los Angeles, CA. (AR 720-23). Dr. Bagner found Plaintiff well-developed and well-nourished, neatly dressed and cooperative throughout the evaluation. (AR 720). Plaintiff reported a history of depression, anxiety, bipolar disorder, hopelessness and low motivation. (Id.). He also indicated that his chronic headaches were negatively affecting his memory and ability to concentrate. (Id.).

Dr. Bagner observed that Plaintiff's "thought processes [were] tight. There [was] no flight of thought, looseness of association, thought blocking or distractability." (AR 722).

1  Based on the foregoing, Dr. Bagner concluded that Plaintiff
2  "would have mild limitations interacting with supervisors, peers
3  and the public, maintaining concentration and attention,
4  completing simple tasks and completing complex tasks." (AR 723).
5  Plaintiff would also experience moderate limitation handling
6  ordinary stresses associated with employment due to depression,
7  low motivation and anxiety. (Id.).

8
9        d.   Dr. Alvin Smith
10
11      On September 28, 2011, Dr. Alvin Smith completed a mental
12  RFC Assessment of Plaintiff based on a review of his medical
13  records. (AR 742-44). Dr. Smith found that Plaintiff was not
14  significantly limited in his ability to remember locations, work
15  procedures, or short and simple instructions. (AR 742).
16  Plaintiff was, however, moderately limited in his ability to
17  understand and remember detailed instructions. (Id.).
18  Similarly, Plaintiff was moderately limited in his ability to
19  carry out detailed instructions and maintain concentration and
20  attention for extended periods. (Id.). He faced no significant
21  limitations in other concentration-related categories, such as
22  the ability to sustain an ordinary work routine, perform
23  activities within a fixed schedule, be punctual, and work in
24  coordination or in proximity with others without being distracted
25  by their presence. (Id.). Dr. Smith concluded that Plaintiff
26  experienced no significant limitations with respect to adapting
27  to his work environment, interacting socially with others, or
28  completing a normal workday or workweek without unreasonable

periods of rest due to psychological symptoms. Accordingly, Dr. Smith opined that Plaintiff could "perform simple work related tasks in a routine work environment; attend and concentrate for extended periods without significant interruption; exercise reasonable judgment with tasks at his cognitive level; and interact appropriately with co-workers, supervisors, and the general public." (AR 744).

C.   **<u>Vocational Expert Testimony</u>**

Vocational Expert ("VE") Frank Corso testified at Plaintiff's October 4, 2012 hearing regarding the existence of jobs in the national economy that Plaintiff could perform given his physical and mental limitations. (AR 452-57). After confirming that the VE reviewed the exhibits provided to him in connection with this case and was present for Plaintiff's testimony before the ALJ, the ALJ asked the VE to consider an individual with Plaintiff's age, education and work experience who is limited to: (1) lifting ten pounds frequently and twenty pounds occasionally; (2) standing and/or walking for four hours during an eight hour work day; and (3) engaging in work that (a) does not require meeting fast paced quotas, (b) is limited to repetitive tasks, (c) does not require contact with the general public, (d) requires only occasional peer contact, (e) does not call for overhead reaching with the left upper extremity, and (f) requires only occasional stooping, kneeling, crouching, and crawling. (AR 454).

\\

The VE testified that an individual sharing Plaintiff's age, education, experience and limitations would be able to perform work as a document preparer at the sedentary level of physical exertion, a final assembler at the sedentary level of physical exertion, and a sorter at the sedentary level of physical exertion. (AR 454-55). The VE opined that these jobs exist in significant numbers in the national economy and in Plaintiff's local economy, and he provided specific job numbers for each occupation. (Id.). The ALJ then asked the VE whether jobs would exist in significant numbers in the national economy for a person with the additional limitation of not being able to perform work in a loud environment. (AR 455). The VE testified that a person with this additional limitation would not be able to work as a sorter because that job "may take place in an environment where the sound level might be more than moderate[,]" but would still be able to perform work as a document preparer or final assembler (Id.).

D.   **Plaintiff's Testimony**

   1.   **October 21, 2008 Hearing**

Plaintiff testified at the first hearing that he had been unable to work since 2006 due to severe, daily headaches and complications from neurosyphilis. (AR 24-25). He was also unable to work due to diarrhea, nausea and hearing loss. (AR 25). The ALJ noted that Plaintiff was able to hear and understand his (the ALJ's) comments during the hearing, and

18

Plaintiff responded that he was only able to hear the ALJ because there were no other sounds in the courtroom. (Id.). He explained "if there were more noises going on, I wouldn't be able to differentiate, in a restaurant I couldn't tell if it was the person across the table or someone across the restaurant talking." Plaintiff testified that if his hearing were not an issue, his recurring headaches would still prevent him from engaging in substantial gainful activity. (AR 31-32). Plaintiff explained that he had taken numerous medications to treat his headaches, but none had proved effective. (AR 32).

Plaintiff claimed that his depression also rendered him incapable of working because it impaired his ability "to do most things." (AR 33). Plaintiff took Wellbutrin for six months to treat his depression but, as of the date of the hearing, was no longer taking that medication. (AR 33-34).

### 2.   January 13, 2009 Hearing

Plaintiff reiterated that he was unable to work due to headaches, syphilis, diarrhea, nausea, hearing loss, depression and fatigue. (AR 43-44). Although Plaintiff claimed that he was receiving treatment for his mental health problems, it was unclear from the Administrate Record whether this statement was accurate. (AR 44-47). Plaintiff testified that his general physical condition was deteriorating due to wasting associated with his HIV, headaches and hearing loss. (AR 52). He described his chronic diarrhea as "scary" and explained that medications

19

such as Immodium AD were unsuccessful in treating this condition. (Id.).  Plaintiff classified his headaches as "severe" and occurring daily.  (Id.).  He also explained that medication did not meaningfully alleviate his headaches.  (Id.).  Plaintiff testified that his headaches were so painful that they interfered with his memory and ability to complete simple tasks, such as remembering and attending appointments.  (AR 57).

Plaintiff further testified that he experienced "residual fatigue" due to his HIV and could not lift twenty-five pounds frequently.  (AR 52-53).  His chronic diarrhea also prevented him from sitting in one place because he frequently needed to take bathroom breaks.  (AR 56).

Finally, Plaintiff testified that he was beset by feelings of depression and worthlessness, which often left him at "a total loss for everything."  (AR 57).  Plaintiff felt hopeless, suffered from insomnia, generally lacked motivation and occasionally experienced suicidal thoughts.  (AR 57-58).

### 3.   December 4, 2012 Hearing

Plaintiff testified that he was diagnosed with bipolar disorder with rapid recycling and no recovery between intermittent cycles of depression.  (AR 440).  This mental disorder "affect[ed] [him] in all kinds of ways from [his] inability to focus and concentrate on tasks[.]"  (Id.). Plaintiff reported feelings of hopelessness, worthlessness and

1  crippling sadness during bouts of depression, which occurred two
2  to three days per week.  (AR 441).

3

4      Plaintiff explained that he suffered from hearing loss, but
5  could maintain a conversation to the extent there was only one
6  sound and/or voice in the room.  (AR 442).  However, "if there is
7  any kind of background noise or the radio or television is on[,
8  he] can't differentiate what the noises are or what the sounds
9  are."  (AR 442).  Moreover, the use of a hearing aid would "just
10 compound [the] problem."  9AR 442-43).

11

12     Plaintiff's headaches started in 2006 due to neurosyphilis
13 and have persisted since that time.  (AR 443).  The headaches no
14 longer occured daily, but Plaintiff still experienced them four
15 to five times per week.  (Id.).  Each headache lasted anywhere
16 from five to fifteen hours.  (Id.).  Plaintiff reported
17 experiencing a "whooshing sensation" in his right eye since 2006,
18 which is painful, "throws [his] balance off and . . . affects
19 [his] vision" sporadically.  (AR 448-50).

20

21     Plaintiff allegedly experienced a recurrence of
22 neurosyphilis in 2011.  (AR 448).  Starting in 2011, Plaintiff
23 started to suffer numbness in his hands and feet, which limited
24 his mobility and made it difficult for him to write and walk.
25 (AR 450).
26 \\
27 \\
28 \\

21

**IV.**

**THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS**

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents him from engaging in substantial gainful activity and that is expected to result in death or to last for a continuous period of at least twelve months. <u>Reddick v. Chater</u>, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work he previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are:

(1) Is the claimant presently engaged in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

(2) Is the claimant's impairment severe? If not, the claimant is found not disabled. If so, proceed to step three.

(3) Does the claimant's impairment meet or equal one of the specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, the claimant is found

1     disabled.  If not, proceed to step four.

2     (4)  Is the claimant capable of performing his past work?

3     If so, the claimant is found not disabled.  If not, proceed

4     to step five.

5     (5)  Is the claimant able to do any other work?  If not, the

6     claimant is found disabled.  If so, the claimant is found

7     not disabled.

8

9 Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari,

10 262 F.3d 949, 953-54 (9th Cir. 2001) (citations omitted); 20

11 C.F.R. §§ 404.1520(b)-(g)(1) & 416.920(b)-(g)(1).

12

13     The claimant has the burden of proof at steps one through

14 four, and the Commissioner has the burden of proof at step five.

15 Bustamante, 262 F.3d at 953-54.  Additionally, the ALJ has an

16 affirmative duty to assist the claimant in developing the record

17 at every step of the inquiry.  Id. at 954.  If, at step four, the

18 claimant meets his burden of establishing an inability to perform

19 past work, the Commissioner must show that the claimant can

20 perform some other work that exists in "significant numbers" in

21 the national economy, taking into account the claimant's residual

22 functional capacity ("RFC"), age, education, and work experience.

23 Tackett, 180 F.3d at 1098, 1100; Reddick, 157 F.3d at 721; 20

24 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).  The Commissioner may do

25 so by the testimony of a vocational expert or by reference to the

26 Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404,

27 Subpart P, Appendix 2 (commonly known as "the Grids").  Osenbrock

28 v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001).  When a claimant

23

1   has both exertional (strength-related) and non-exertional

2   limitations, the Grids are inapplicable and the ALJ must take the

3   testimony of a vocational expert.  Moore v. Apfel, 216 F.3d 864,

4   869 (9th Cir. 2000) (citing Burkhart v. Bowen, 856 F.2d 1335,

5   1340 (9th Cir. 1988)).

6

7                                   V.

8                          THE ALJ'S DECISION

9

10       The ALJ employed the five-step sequential evaluation process

11  and concluded that Plaintiff was not under a disability within

12  the meaning of the Social Security Act from December 31, 2003

13  through the date of the ALJ's decision on October 24, 2012.  (AR

14  426).  At step one, the ALJ found that Plaintiff had not engaged

15  in substantial gainful employment since December 31, 2003.  (AR

16  419).  At step two, the ALJ found that Plaintiff had the severe

17  impairments of HIV infection with a history of neurosyphilis and

18  a depressive disorder.  (Id.).  At step three, the ALJ found that

19  Plaintiff did not have an impairment or combination of

20  impairments that met or medically equaled one of the listed

21  impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Id.).

22  The ALJ then found that Plaintiff had the following RFC:

23

24       [Plaintiff] has the residual functional capacity to

25       perform light work as defined in 20 C.F.R. 404.1567(b)

26       except for any work involving standing or walking for

27       more than four hours in an eight hours workday; more

28       than occasional stooping, kneeling, crouching or

                                   24

1    crawling; any work involving overhead reaching with the

2    left upper extremity; any work involving more than

3    simple repetitive tasks; any fast-paced quotas; any

4    public contact; and more than occasional contact with

5    peers.

6

7    (AR 420).  In making this finding, the ALJ first addressed, at

8    length, the disconnect between the alleged severity and frequency

9    of Plaintiff's symptoms and the evidence in the Administrative

10   Record.  To begin, the ALJ detailed Plaintiff's medical history

11   from April 2006 to June 2011.  (AR 421-22).  The ALJ explained

12   that although Plaintiff was treated in 2006 and 2007 for

13   neurosyphilis resulting in hearing loss, "progress notes from

14   AIDS Healthcare Foundation show that [Plaintiff] continued to do

15   relatively well into 2007: his T-Cell was 420 and viral load was

16   4000; he was still not taking any medications; and he was

17   'asymptomatic.'"  (AR 421).  Moreover, as of June 2007,

18   Plaintiff did not report taking any medications for his headaches

19   and in November 2007, he "voiced no further complaint of

20   headache, and he was still not taking antiretroviral

21   medications."  (Id.).  By 2008, Plaintiff commenced

22   antiretroviral treatment, causing his CD4 count to increase and

23   his viral load to decrease to undetectable levels.  (Id.).  The

24   ALJ noted that Plaintiff continued to receive routine treatment

25   for his HIV thereafter, although Plaintiff occasionally sought

26   treatment for "urgent" symptoms such as oral thrush, "whooshing"

27   eye movements, skin abscesses and tinnitus.  (Id.).

28   \\

25

The ALJ noted that in Plaintiff's various progress reports from the AIDS Healthcare Foundation between June 2006 and August 2011, Plaintiff was "consistently described as either Kanofsky scale 80 (normal activity with effort; some signs or symptoms of disease) or 90 (able to carry on normal activity; minor signs or symptoms of disease)." (Id.). According to the ALJ, Plaintiff's 2010 and 2011 medical records from the Gay & Lesbian Center reflect routine HIV treatment and monitoring, but do not corroborate the severely limiting symptoms that Plaintiff alleged. (AR 422). Although Plaintiff was treated for acute diarrhea in November 2007, the ALJ explained that this single documented instance of severe diarrhea did not support Plaintiff's allegation of consistent diarrhea occurring four to five times per day. (Id.). Similarly, "the record [did] not demonstrate weight loss consistent with wasting syndrome." (Id.). The ALJ observed that "there have been significant periods of time since the alleged onset date during which [Plaintiff] has not taken prescribed medications for the allegedly disabling symptoms, undermining [his] allegation that he has tried but been unable to find a way to remedy his headaches[.]" (Id.).

After his detailed review of Plaintiff's medical history, the ALJ addressed the opinions of Plaintiff's treating, examining and non-examining physicians. First, the ALJ acknowledged the opinions of examining consultative physicians Drs. To and Karamlou. Dr. To examined Plaintiff in June 2007 and concluded that Plaintiff could perform "medium exertion with physical

26

1  functions requiring agility and postural functions to be
2  performed on a frequent basis." (Id.). More recently, in August
3  2011, Dr. Karamlou examined Plaintiff and determined that he "did
4  not have any physical restrictions whatsoever." (Id.).

5

6      Next, the ALJ gave "great weight" to the opinion of Dr.
7  Biddison, Plaintiff's treating physician at the Los Angeles Gay &
8  Lesbian Center. (Id.). In September 2008, Dr. Biddison opined
9  that Plaintiff had "normal clinical examination findings and that
10 he retained the ability to lift 50 pounds occasionally and 25
11 pounds frequently, stand and walk about 4 hours (with normal
12 breaks) during an 8-hour day, sit without limitation, frequently
13 perform all postural activities) and use the upper
14 extremities . . . without limitation, but he should avoid
15 concentrated exposure to humidity and respiratory iritants[.]"
16 (Id.). The ALJ noted that Dr. Biddison's assessment was more
17 restrictive, i.e., more favorable to Plaintiff, than the opinions
18 of non-examining physician Dr. Talcherkar and Plaintiff's
19 treating physician from DHMC, Dr. Logan. (AR 423).

20

21     Next, the ALJ discussed the opinion of Plaintiff's treating
22 physician at AHF, Dr. McKellar. (Id.). In November 2007, Dr.
23 McKellar opined that Plaintiff could "lift/carry 20 pounds
24 occasionally and 10 pounds frequently, stand/walk up to 4 hours
25 in an 8-hour workday, and sit without limitation." (Id.). The
26 ALJ acknowledged that Dr. McKellar's assessment was "more
27 restrictive" than Dr. Biddison's "insofar as lifting is limited
28 to the 'light' level of exertion[,]" but explained that none of

Dr. McKellar's findings were inconsistent with the conclusion that Plaintiff had the capacity to perform light work at the sedentary level of exertion. (Id.). The ALJ further noted that although Dr. McKellar stated that Plaintiff's "biggest problems" were headaches, diarrhea, hearing loss, anxiety and depression, the medical evidence did not support a finding that these problems were disabling within the meaning of the Social Security Act. (Id.). An April 2007 report from Dr. McKellar did not indicate that Plaintiff was markedly limited in his ability to function socially, maintain concentration, or conduct activities daily life activities. (Id.). A May 2007 progress note signed by Dr. McKellar described Plaintiff's headaches as severe, but occurring only intermittently, i.e., not daily, as Plaintiff alleged. (Id.). Moreover, Dr. McKellar diagnosed Plaintiff with "tension" headaches, "as opposed to a more serious condition such as migraines," in November 2007. (Id.). Finally, the ALJ cited a December 2011 medical record from AHF indicating that Plaintiff reported that he was no longer suffering from headaches. (Id.).

As to Plaintiff's hearing loss, the ALJ stated that the only medical opinion addressing any limitations resulting from Plaintiff's hearing issues was Dr. Talcherkar's November 2007 physical RFC assessment, which indicated that Plaintiff had unlimited communicative abilities. (Id.).

The ALJ gave "little weight" to the statement from Michael Barrett, Plaintiff's case manager at AIDS Project L.A., who claimed that Plaintiff's conditions rendered him "disabled."

28

1  (Id.) (citing AR 348).   The ALJ dismissed Mr. Barrett's opinion

2  on the grounds that Mr. Barrett is not a physician and "his

3  conclusory statement represent[ed] a determination on an issue

4  that is reserved to the Commissioner[.]"   (Id.).   The ALJ also

5  explained that Mr. Barrett's opinion was "sharply" at odds with

6  the other opinion evidence in the record.

7

8      With respect to Plaintiff's mental health, the ALJ noted

9  that examining consulting physician Dr. Brawer found that

10  Plaintiff "had only a mild depressive disorder which 'may' result

11  in mildly diminished abilities to sustain attention and

12  concentration, handle work stresses, and sustain motivation and

13  stamina."   (AR 424).   The ALJ concluded that the absence of a

14  diagnosed depressive order in Plaintiff's copious treatment

15  records "cast additional doubt" on the alleged severity of

16  Plaintiff's depressive order.   In the same vein, the ALJ stated

17  that Plaintiff's treatment records show, at best, intermittent

18  and short-term use of psychotropic medications designed to

19  alleviate the symptoms of depression and/or anxiety.   (Id.).

20

21      The ALJ appears to have given significant weight to the

22  opinion of examining consulting physician Dr. Bagner, who

23  performed a psychiatric evaluation of Plaintiff in August 2011.

24  (AR 424).   During his examination with Dr. Bagner, Plaintiff

25  reported mood swings, feelings of helplessness and hopelessness,

26  low motivation, difficulty with memory and concentration, and

27  panic attacks.   (Id.).   Dr. Bagner diagnosed Plaintiff as bipolar

28  with no additional specification.   (Id.).   Dr. Bagner concluded

29

that Plaintiff had "moderate limitations in his ability to handle work stresses and complete a normal work week, but only mild limitations in his ability to interact with others, maintain concentration and attention, and complete simple and complex tasks." (Id.). The ALJ described Dr. Bagner's findings as "unremarkable other than showing some mild limitations in memory and concentration." (Id.).

At step four, the ALJ determined that Plaintiff was unable to perform any past relevant work. (AR 425). At step five, the ALJ considered Plaintiff's age, education, work experience and RFC. (Id.). Plaintiff was thirty-one years old on the alleged disability onset date, and he was therefore a "younger individual" pursuant to 20 C.F.R. 404.1563. (Id.). Plaintiff has at least a high school education and is able to communicate in English. (Id.). The ALJ also concluded that transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled" whether or not he has transferable job skills. (Id.).

Next, based on the testimony of VE Frank Corso, the ALJ found that, considering Plaintiff's age, education, work experience and RFC, there were jobs existing in significant numbers in the national economy that Plaintiff could perform. (AR 425-26). The ALJ concluded that Plaintiff could perform the

\\

\\

1    work of a document preparer, a final assembler, or a sorter. (AR

2    426).   The ALJ further determined that such jobs existed in

3    significant numbers in the national economy. (Id.).

4

5                                   **VI.**

6                         **STANDARD OF REVIEW**

7

8        Under 42 U.S.C. § 405(g), a district court may review the

9    Commissioner's decision to deny benefits.   The court may set

10   aside the Commissioner's decision when the ALJ's findings are

11   based on legal error or are not supported by substantial evidence

12   in the record as a whole. Aukland v. Massanari, 257 F.3d 1033,

13   1035 (9th Cir. 2001) (citing Tackett, 180 F.3d at 1097); Smolen

14   v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing Fair v.

15   Bowen, 885 F.2d 597, 601 (9th Cir. 1989)).

16

17       "Substantial evidence is more than a scintilla, but less

18   than a preponderance." Reddick, 157 F.3d at 720 (citing Jamerson

19   v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)).   It is "relevant

20   evidence which a reasonable person might accept as adequate to

21   support a conclusion." Id. (citing Jamerson, 112 F.3d at 1066;

22   Smolen, 80 F.3d at 1279).    To determine whether substantial

23   evidence supports a finding, the court must "'consider the record

24   as a whole, weighing both evidence that supports and evidence

25   that detracts from the [Commissioner's] conclusion.'"  Aukland,

26   257 F.3d at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th

27   Cir. 1993)).    If the evidence can reasonably support either

28   affirming or reversing that conclusion, the court may not

                                    31

1    substitute its judgment for that of the Commissioner.  Reddick,

2    157 F.3d at 720-21 (citing Flaten v. Sec'y, 44 F.3d 1453, 1457

3    (9th Cir. 1995)).

4

5                                **VII.**

6                            **DISCUSSION**

7

8        Plaintiff challenges the ALJ's decision on four grounds.

9    First, Plaintiff contends that the ALJ erred in assessing

10   Plaintiff's credibility and discrediting his subjective symptoms.

11   (Memorandum in Support of Plaintiff's Complaint ("MSPC") at 3-9).

12   According to Plaintiff, the ALJ "failed to make specific, clear,

13   or convincing findings regarding [Plaintiff's] credibility, and

14   instead improperly states that basis of the credibility

15   determination is a lack of objective evidence to support

16   [Plaintiff's] alleged symptoms and limitations."  (Id. at 8).

17   Second, Plaintiff argues that the ALJ erred in failing to find

18   that Plaintiff's headaches and hearing loss were "severe

19   impairments" at step two of the five-step sequential process.

20   (Id. at 9-12).  Third, Plaintiff claims that the ALJ failed to

21   properly consider the combined effects of his impairments when

22   determining the appropriate RFC.  (Id. at 12-16).  Fourth,

23   Plaintiff asserts that the ALJ's non-disability finding at step

24   five was not supported by substantial evidence.  (Id. at 17-18).

25

26       The Court disagrees with Plaintiff on each proffered ground

27   for reversing the ALJ's ruling.  Accordingly, for the reasons

28   discussed below, the Court AFFIRMS the ALJ's decision.

                                 32

A.   **The ALJ Cited Clear And Convincing Reasons For Finding Plaintiff's Statements Less Than Fully Credible**

Plaintiff contends that the ALJ erred by failing to articulate specific, clear, or convincing reasons for finding Plaintiff's subjective statements less than fully credible. (MSPC at 8). The Court disagrees. The ALJ's decision contains extensive citation to and discussion of clear and convincing reasons for rejecting Plaintiff's statements.

When assessing the credibility of a claimant, the ALJ must engage in a two-step analysis. Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012). First, the ALJ must determine if there is medical evidence of an impairment that could reasonably produce the symptoms alleged. (Id.). Then, if there is, in order to reject the testimony, the ALJ must make specific credibility findings. (Id.). In assessing the claimant's testimony, the ALJ may use "ordinary techniques of credibility evaluation." Turner, 613 F.3d at 1224 (internal quotations omitted). The ALJ may also consider any inconsistencies in the claimant's conduct and any inadequately or unexplained failure to pursue treatment or follow treatment. Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008). Additionally, the ALJ may discredit the claimant's testimony where his normal activities can transfer to the work setting. Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999). The Court notes that it is improper for an ALJ to reject subjective testimony based "solely" on its inconsistencies with the objective medical evidence presented.

33

1  <u>Bray v. Comm'r of Soc. Sec. Admin.</u>, 554 F.3d 1219, 1227 (9th Cir.

2  2009) (citing <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 345 (9th Cir.

3  1991)).  However, an ALJ may consider such inconsistencies as one

4  factor, among many, bearing on the credibility of a plaintiff's

5  subjective testimony.  <u>See, e.g.</u>, <u>Thomas v. Barnhart</u>, 278 F.3d

6  947, 958-60 (9th Cir. 2002) (ALJ properly considered the lack of

7  objective medical evidence, as well as other factors, in

8  evaluating the credibility of a plaintiff's subjective testimony

9  regarding the severity of her impairments and pain); <u>Morgan</u>, 169

10  F.3d at 599-600 (same).

11

12      Here, there was ample medical evidence of Plaintiff's

13  underlying impairments.  However, the ALJ articulated specific,

14  clear and convincing reasons for discounting Plaintiff's

15  testimony about the severity of his physical and mental symptoms.

16  First, the ALJ cited extensively to the Administrative Record to

17  demonstrate that the objective medical evidence in this case

18  directly contradicted Plaintiff's statements.  To begin,

19  Plaintiff reported headaches and hearing loss throughout 2007

20  after contracting neurosyphilis in 2006.  However, "an internal

21  medicine consultative examination performed on June 27, 2007"

22  indicated that Plaintiff "was not reportedly taking any

23  medication for either headaches or HIV." (AR 421).  Plaintiff

24  did not complain of headaches during his November 1, 2007 visit

25  to AHF. (<u>Id.</u>) (citing AR 299).  Although Plaintiff complained of

26  headaches during other visits to AHF and was prescribed Ibuprofen

27  and Midrin, his headaches were never diagnosed as migraines or

28  anything more severe than "tension headaches." (AR 421, 423).

1   Despite Plaintiff's claim that his headaches adversely impacted
2   his mobility and ability to function, Plaintiff's Karnofsky scale
3   was typically 90 and never dropped below 80, a fact that
4   indicates Plaintiff, at his worst, retained the ability to engage
5   in normal activity with effort.  (AR 421).  In treatment notes
6   from May 2008, there is no mention of Plaintiff's headaches, (AR
7   344), and in December 2011, Plaintiff informed a neurologist at
8   AHF that his headaches were "mostly" resolved.  (AR 423).

9

10      In addition to focusing on treatment records contradicting
11  Plaintiff's claim of daily, crippling headaches, the ALJ also
12  discussed, at length, the opinions of Plaintiff's treating
13  physicians, Drs. Biddison and McKellar.  (AR 422-23).  The ALJ
14  gave "great weight" to Dr. Biddison's conclusion that Plaintiff
15  could lift fifty pounds occasionally and twenty-five pounds
16  frequently, stand and walk for four hours per workday, sit
17  without limitation, and frequently perform all postural
18  activities.  (AR 422).  The ALJ found that this opinion was
19  partially confirmed by Dr. McKellar, who concluded that although
20  Plaintiff could stand and walk for four hours per workday, he was
21  limited to carrying and lifting twenty pounds occasionally and
22  ten pounds frequently.  (AR 423).  The opinions of Plaintiff's
23  examining consulting physicians, Drs. To and Karamlou, also
24  undermined Plaintiff's credibility, as neither doctor concluded
25  that Plaintiff suffered from significant, much less severe,
26  physical limitations due to any physical impairment.  (AR 422).
27  \\
28  \\

35

1    With respect to Plaintiff's diarrhea and hearing loss, the
2  ALJ correctly noted that the objective medical evidence belied
3  Plaintiff's claims that these conditions were so extreme as to
4  render him incapable of substantial gainful activity. The ALJ
5  explained that the Administrative Record contained a single
6  verified example of Plaintiff suffering from acute diarrhea –
7  that is, there was nothing in the medical evidence corroborating
8  what Plaintiff described as "chronic" and "scary" diarrhea. (AR
9  422) (citing AR 298). Moreover, the "only medical opinion to
10 address any potential hearing limitation indicate[d] that
11 [Plaintiff] ha[d] unlimited communicative abilities."[2]  (AR 423)
12 (citing AR 290). Although there is little doubt that Plaintiff
13 suffered from hearing loss, the ALJ found that the objective
14 medical evidence did not substantiate Plaintiff's allegations
15 regarding the effects of this hearing loss on his ability to
16 work.

17

18    Because the objective medical findings discussed above
19 directly contradicted Plaintiff's claims regarding the severity,
20 frequency and consequences of his physical symptoms, the ALJ
21 properly weighed this evidence as one factor, among many, in
22 determining the credibility of Plaintiff's statements.

23

24  [2]   In addition to Dr. Talcherkar's opinion regarding
25 Plaintiff's communicative limitations, Dr. To found that
   Plaintiff's hearing appeared to be "adequate." (AR 264).
26 Although the ALJ failed to acknowledge this medical opinion
   addressing Plaintiff's hearing loss, Dr. To's opinion
27 nevertheless supports the ALJ's conclusion that the objective
   medical evidence in this case is inconsistent with Plaintiff's
28 statements regarding the severity and frequency of his symptoms.

As to Plaintiff's mental impairments, the ALJ found that Plaintiff's statements regarding the severity of his mental impairments not credible to the extent they directly conflicted with the objective medical evidence. The ALJ noted that the absence of a diagnosed depressive order in Plaintiff's extensive treatment notes "cast doubt on the alleged severity of his depressive symptoms" given Plaintiff's frequent contact with medical professionals from 2006 to 2011. (AR 424). Further, there was no evidence that Plaintiff consistently took psychotropic medication to reduce the effects of his mental impairments. (Id.).

The ALJ also relied on Plaintiff's physicians' opinions in determining the credibility of his statements. The ALJ cited the opinion of examining consulting physician Dr. Brawer, who found that Plaintiff had a "mild depressive disorder which 'may' result in mildly diminished abilities to sustain attention and concentration, handle work stresses, and sustain motivation and stamina." (AR 424). The ALJ also relied on the opinion of Dr. Bagner, who examined Plaintiff in 2011 and concluded that Plaintiff had "moderate limitations in his ability to handle work stresses and complete a normal work week, but only mild limitations in his ability to interact with others, maintain concentration and attention, and complete simple tasks." (Id.). These medical opinions, as well as inconsistencies in the medical evidence regarding the frequency and severity of Plaintiff's mental impairments, were relevant factors in the ALJ's \\

37

1    determination that, contrary to Plaintiff's claims, Plaintiff's

2    depressive disorder was not disabling.

3

4         Second, the ALJ properly cited Plaintiff's failure to pursue

5    and follow treatment as an indication that his subjective

6    statements were unreliable.  (AR 422); see Tommasetti, 533 F.3d

7    at 1039 (an ALJ may consider many factors in weighing a

8    claimant's credibility, including "unexplained or inadequately

9    explained failure to seek treatment or to follow a prescribed

10   course of treatment[]") (internal quotation marks omitted).

11   Despite an alleged disability onset date of December 31, 2003,

12   Plaintiff, contrary to his doctor's recommendations, continued

13   using crystal methamphetamine throughout 2004, resisted attending

14   rehab in 2006, remained dependent on amphetamines in 2007, and

15   did not commence antiretroviral treatment for his HIV until late

16   2007 or early 2008.  (AR 188-89, 194, 197, 233, 244, 248, 261,

17   421).  Although Plaintiff started visiting AHF in or around June

18   2006, he did not seek or receive anti-headache medication until

19   May 2007.  (AR 294).

20

21        With respect to Plaintiff's mental health, Plaintiff was

22   prescribed psychotropic medication in November 2007, (AR 299),

23   but stopped using it shortly thereafter.  (AR 33-34).  Moreover,

24   Plaintiff's most recent medical records failed to show any formal

25   mental health treatment despite his allegedly severe bipolar

26   disorder and chronic depression.  (AR 424).

27   \\

28   \\

1    The Court agrees with the ALJ's finding that, taken
2    together, Plaintiff's unexplained delay in seeking treatment,
3    ongoing drug use, and failure to continue treatment render his
4    allegations of debilitating physical and mental impairments
5    dubious. Were Plaintiff's symptoms as severe as he claimed, it
6    seems likely that he would have consistently sought treatment,
7    heeded his doctors' advice and made the necessary lifestyle
8    changes to improve his overall wellbeing. Accordingly, the ALJ's
9    citation to and reliance on Plaintiff's treatment history was
10   proper.

11

12   Thus, after reviewing the ALJ's decision and based on the
13   foregoing, the Court finds that the ALJ provided sufficiently
14   clear and convincing reasons for discounting Plaintiff's
15   subjective statements.

16

17   **B. The ALJ Properly Found That Plaintiff's Headaches And**
18   **Hearing Loss Were Not Severe Impairments**

19

20   At step two of the five-step sequential process, a claimant
21   must make a threshold showing that his medically determinable
22   impairment or combination of impairments is "severe," _i.e._, that
23   it "significantly limits his ability to do basic work
24   activities[.]" Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir.
25   2005) (quoting 20 C.F.R. § 404.1521(b)). By its terms, step two
26   is a "de minimis screening device to dispose of groundless
27   claims." Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996)
28   (citing Bowen v. Yuckert, 482 U.S. 137, 153-54 (1987)). Once a

39

claimant meets his burden of demonstrating that he suffers from an impairment "significantly limiting" his ability to perform basic work activities – which include the "abilities and aptitudes necessary to do most jobs[,]" Ramirez v. Astrue, 803 F. Supp. 2d 1075, 1085 (C.D. Cal. 2011) (citing 20 C.F.R. §§ 404.1521(a), 416.921(b)) – the impairment is considered "severe" and the ALJ must proceed to the next step in the sequential evaluation process. See Edlund v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001).

However, an impairment or combination of impairments is not "severe" if the evidence establishes only a "slight abnormality that has no more than a minimal effect on an individual's ability to work." Smolen, 80 F.3d at 1290 (internal quotations and citations omitted); see also Webb, 433 F.3d at 686 ("An impairment is not severe if it is merely "a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities."). Thus, the mere existence of an impairment is insufficient proof of a severe or disabling condition.

Here, as discussed above, the Administrative Record lacks reliable medical evidence concerning the impact of Plaintiff's diagnosed headaches and hearing loss on his ability to engage in basic work activities. Although Plaintiff claimed that he was unable to engage in substantial gainful employment due, in part, to these physical impairments, neither his treating nor examining physicians concluded that Plaintiff faced any prohibitive

exertional or communicative limitations due to his headaches or hearing loss.  In April 2007, Dr. McKellar declined to indicate that Plaintiff suffered from marked restrictions on his ability to engage in daily activities or social functioning, or to timely complete tasks.  (AR 238).  In November 2007, Dr. McKellar opined that despite Plaintiff's chronic illness, including his headaches and hearing loss, he was able to occasionally lift twenty pounds, frequently lift ten pounds, walk for up to four hours per day and sit without limitation.  (AR 156-57).

In 2008, Plaintiff's other treating phycian, Dr. Biddison, opined that Plaintiff was capable of engaging in an even greater range of exertional activities, including lifting up to fifty pounds occasionally, stooping, crouching, bending and climbing without limitation, engaging in fine and gross manipulation without limitation and working in different work environments, except those involving exposure to humidity and concentrated airborne irritants (such as fumes and dusts).  (AR 385-87).

Dr. To examined Plaintiff in June 2007 and concluded that his hearing was "adequate" and Plaintiff could engage in a range of activities generally consistent with those described by Drs. McKellar and Biddison.  (AR 262-66).  Finally, Dr. Karamlou examined Plaintiff in October 2011 and found that despite his headaches and decreased hearing acuity in the right ear, Plaintiff was under "no restrictions with standing, walking, bending, lifting, or carrying" and he had no difficulty with gross and fine manipulation.  (AR 729).  Moreover, although there

was ample proof in the record that Plaintiff suffered from a hearing impairment, (AR 765), the only medical opinions addressing the effects of Plaintiff's hearing loss on his ability to function do not support a finding of a "severe" impairment. (AR 264, 290). Accordingly, there is no basis to conclude that these impairments in fact interfered with his ability to engage in basic work activities. Indeed, a finding to the contrary would cut directly against the weight of the clear and specific findings of every doctor that treated or examined Plaintiff from 2006 to 2011.

However, even if the ALJ erroneously failed to find Plaintiff's headache and hearing loss "severe" at step two, this error was "inconsequential to the ultimate non-disability determination" in this case and therefore harmless. See Molina, 674 F.3d at 1115 (discussing the applicability of the harmless error rule to Social Security cases). An ALJ's failure to identify an impairment as severe at step two is harmless error if the ALJ adequately considers that impairment at step four. See Johnson v Colvin, 949 F. Supp. 2d 1025, 1039 (S.D. Cal. 2013) (citing Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007)).

At step four, the ALJ conducted an in-depth review of the subjective testimony and objective medical evidence concerning Plaintiff's headaches and hearing loss. (AR 420-25). Based on his review of the relevant evidence, including the opinions of Plaintiff's treating and examining physicians, the ALJ concluded that "it is apparent that [Plaintiff's] headaches, to whatever

42

frequency and degree he experiences them, have not been shown to result in any actual physical limitations." (AR 423). Furthermore, "whatever limitations (if any) the [Plaintiff's] headaches impose were clearly taken into account" by Plaintiff's physicians in their conclusions regarding his physical functional limitations. (Id.). With respect to Plaintiff's hearing loss, the ALJ acknowledged the existence of this impairment, but correctly noted the absence of any medical evidence indicating that Plaintiff's hearing interfered with his ability to effectively communicate or understand instructions. (Id.).

Plaintiff may disagree with the ALJ's conclusions regarding his headaches and hearing loss and the weight assigned each impairment in determining Plaintiff's RFC. However, this disagreement does not negate the ALJ's full consideration of Plaintiff's headaches and hearing loss at step four. Thus, any failure at step two to identify Plaintiff's headaches and hearing loss as "severe" was harmless. See Lewis, 498 F.3d at 911.

**C.   The ALJ Properly Considered The Combined Effects Of Plaintiff's Impairments When Determining Plaintiff's RFC**

"A residual functional capacity is a measure of the physical ability the claimant possesses despite his limitations." Frost v. Barnhart, 314 F.3d 359, 366 (9th Cir. 2002) (citing 20 C.F.R. § 416.945). A RFC assessment requires the ALJ to consider a claimant's impairments and any related symptoms that may "cause physical and mental limitations that affect what [he] can do in a

43

1  work setting." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).   In

2  determining a claimant's RFC, the ALJ considers all relevant

3  evidence, including residual functional capacity assessments made

4  by consultative examiners, State Agency physicians and medical

5  experts.  20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).  <u>See also</u>

6  20 C.F.R. §§ 404.1513(c), 416.913(c).  If a physician's RFC

7  assessment is not contradicted by another physician, the ALJ must

8  provide clear and convincing reasons for rejecting that opinion.

9  <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1995) (as amended)

10  ("[T]he Commissioner must provide 'clear and convincing' reasons

11  for rejecting the uncontradicted opinion of an examining

12  physician.").

13

14      "The ALJ is required to consider all of the limitations

15  imposed by the claimant's impairments, even those that are not

16  severe . . . . Even though a non-severe impairment[] standing

17  alone may not significantly limit an individual's ability to do

18  basic work activities, it may - when considered with limitations

19  or restrictions due to other impairments - be critical to the

20  outcome of a claim." <u>Carmickle v. Comm'r of the Soc. Sec.</u>

21  <u>Admin.</u>, 533 F.3d 1155, 1164 (9th Cir. 2008) (quoting SSR 96-8p

22  (1996)) (internal quotation marks omitted) (citations omitted).

23

24      Here, the functional limitations contained within the ALJ's

25  RFC adequately accounted for all of Plaintiff's severe and non-

26  severe impairments.  Plaintiff claimed that he was unable to

27  engage in substantial gainful activity due to neurosyphilis,

28  headaches, hearing loss, diarrhea, HIV-related wasting,

44

depression, bipolar disorder and fatigue.  He also alleged that he suffered from a sporadic "whooshing" sensation in his eye that was painful and upset his sense of balance.  As discussed above, the ALJ addressed Plaintiff's subjective testimony and the medical evidence in the record concerning all of Plaintiff's impairments and alleged symptoms.  The ALJ concluded that the medical evidence did not support a finding of any headache-related limitations other than those already incorporated into Dr. McKellar's November 2007 assessment of Plaintiff's functional limitations.  (AR 423).  Similarly, the ALJ found scant evidence that Plaintiff's hearing loss adversely impacted his ability to engage in substantial gainful employment.  (AR 423).  The ALJ noted that despite Plaintiff's claim of chronic diarrhea occurring four to five times daily, the Administrative Record contained only one example of Plaintiff being treated for acute diarrhea lasting several days.  (AR 422) (citing AR 298-302).  To the extent Petitioner suggested that his health was deteriorating because of HIV-related "wasting," the ALJ correctly noted that "the record does not demonstrate weight loss consistent with wasting syndrome."  (AR 422).

    The ALJ lent "great weight" to the opinion of treating physician Dr. Biddison concerning Plaintiff's physical limitations.  (AR 422-23).  He also considered the opinion of treating physician Dr. McKellar, and it appears that the ALJ assigned Plaintiff a more restrictive, i.e., more favorable RFC based, in part, on Dr. McKellar's findings.  For example, the ALJ's RFC limits Plaintiff to "light work" with additional

1   limitations – this RFC is at odds with Dr. Biddison's finding

2   that Plaintiff could lift fifty pounds occasionally and twenty-

3   five pounds frequently, but consistent with Dr. McKellar's

4   opinion.  (Id.).  In limiting Plaintiff to light work with

5   additional limitations, the ALJ also departed, to Plaintiff's

6   benefit, from the opinions of the consulting physicians who

7   examined Plaintiff in 2007 and 2011.  (AR 422).

8

9        With respect to Plaintiff's mental limitations, the ALJ

10  undertook a lengthy discussion of the opinions of Drs. Brawer and

11  Bagner, the examining physicians who performed psychiatric

12  evaluations of Plaintiff in 2007 and 2011.  (AR 423-24).  Dr.

13  Brawer concluded that Plaintiff had the capacity to learn simple

14  repetitive tasks, although he may experience "mildly" diminished

15  concentration and attention due to emotional factors.  (AR 281).

16  Because Plaintiff displayed symptoms of anxiety and depression

17  that could interfere with his ability to deal with ordinary work

18  stresses, Dr. Brawer concluded that Plaintiff would function

19  "optimally in a semi-isolated work setting."  (AR 284).  Roughly

20  four years later, Dr. Bagner found that Plaintiff's thought

21  processes were "tight," but that he would have "mild limitations

22  interacting with supervisors, peers and the public, maintaining

23  concentration and attention, completing simple tasks and

24  completing complex tasks."  (AR 722-23).  The ALJ's RFC

25  adequately reflected the limitations recommended by Drs. Brawer

26  and Bagner – the RFC limited Plaintiff to light work of a

27  repetitive (i.e., simple) nature that does not require meeting

28  fast-paced quotas (i.e., low-stress) or interaction with the

general public (_i.e._, semi-isolated).   (AR 420).   Indeed, the ALJ's RFC closely tracks the precise mental limitations that Plaintiff's examining physicians identified.

Based on the foregoing, there is no reason to conclude that the ALJ failed to properly consider all of Plaintiff's medically determinable impairments, both severe and non-severe, in assigning Plaintiff a RFC.   Plaintiff's RFC reflects his physical and mental impairments and, as a general matter, represents a reading of the medical evidence generally favors Plaintiff.

**D.   Substantial   Evidence   Supported   The   ALJ's   Non-Disability Determination**

"Substantial evidence is more than a scintilla, but less than a preponderance."   Reddick, 157 F.3d at 720 (citing Jamerson, 112 F.3d at 1066).   It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion." Id. (citing Jamerson, 112 F.3d at 1066; Smolen, 80 F.3d at 1279).   Here, the objective medical evidence in the record, coupled with the opinions of Plaintiff's physicians and Vocational Expert Frank Corso, was more than sufficient to support the ALJ's decision.

First, the objective medical evidence supported the RFC that the ALJ assigned to Plaintiff.   The ALJ correctly noted that Plaintiff's treatment records "contain relatively few references to symptoms[]"   and   Plaintiff   inconsistently   reported   his

allegedly disabling impairments to medical professionals between 2003 and 2011. (AR 422). Although Plaintiff complained of headaches frequently, his headaches were attributed to "tension" and were treated conservatively with Ibuprofen and Midrin. (AR 421, 423). In treatment notes from May 2008, there is no mention of Plaintiff's headaches, (AR 344), and in December 2011, Plaintiff informed a neurologist at AHF that his headaches were "mostly" resolved. (AR 423). In November 2007, Dr. McKellar opined that despite his headaches and hearing loss, Plaintiff was able to occasionally lift twenty pounds, frequently lift ten pounds, walk for up to four hours per day and sit without limitation. (AR 156-57). Moreover, in 2008, Dr. Biddison found that Plaintiff could engage in an even wider range of exertional activities notwithstanding his headaches and other impairments. (AR 385-87). The opinions of examining Drs. To and Karamlou supported Plaintiff's treating physicians' conclusions. (AR 262-66, AR 726-29). For example, Dr. To concluded that Plaintiff's hearing was "adequate," (AR 264), a finding that non-examining physician Dr. Talcherkar confirmed. (AR 290) (finding that Plaintiff suffered no communicative limitations).

Although non-examining physician Dr. Armstrong assigned Plaintiff a RFC more restrictive than the ALJ's, (AR 746-48) her opinion, without more, is an insufficient basis for discrediting the opinions of Plaintiff's treating and examining doctors. See Moore v. Comm'r of Soc. Sec. Admin., 278 F.3d 920, 924 (9th Cir. 2002) (ALJ can reject opinions of examining physician, contradicted by a non-examining physician, only for "specific and

48

1  legitimate reasons that are supported by substantial evidence in
2  the record") (internal quotations omitted); Morgan, 169 F.3d at
3  600 ("When a nontreating physician's opinion contradicts that of
4  the treating physician – but is not based on independent clinical
5  findings, or rests on clinical findings also considered by the
6  treating physician – the opinion of the treating physician may be
7  rejected only if the ALJ gives specific, legitimate reasons for
8  doing so that are based on substantial evidence in the record.")
9  (internal quotations omitted).    Plaintiff also complained of
10 chronic, severe diarrhea, but the medical evidence contains only
11 one example of Plaintiff experiencing acute diarrhea requiring
12 treatment.  (AR 298).

13

14    With respect to Plaintiff's depressive disorder, the ALJ
15 noted that the medical records indicate that Plaintiff
16 inconsistently reported his mental impairments, continued to use
17 methamphetamine despite his doctors' recommendations and
18 discontinued use of psychotropic medication designed to improve
19 his mental functioning.  (AR 33-34, 244, 424).   Moreover,
20 Plaintiff's extensive treatment notes failed to indicate any
21 diagnosed mental disorder, and Plaintiff's most recent records
22 contained no indication that he was receiving mental health care.
23 (AR 425).

24

25    The ALJ also relied on the opinions of Plaintiff's examining
26 physicians, Drs. Brawer and Bagner.  In 2007, Dr. Bawer concluded
27 that Plaintiff had the capacity to learn simple repetitive tasks
28 and could perform detailed varied or complex tasks.  (AR 283).

49

Plaintiff's capacity for extended periods of sustained concentration and attention "may be mildly diminished, primarily due to emotional factors[]" and Plaintiff displayed symptoms of anxiety and depression, which could adversely impact his ability to deal with ordinary work stresses. (Id.). Accordingly, Dr. Brawer opined that Plaintiff "may function most optimally in a semi-isolated work setting" despite his ability to relate appropriately with supervisory authority figures. (AR 284). In 2011, Dr. Bagner observed that Plaintiff's "thought processes [were] tight. There [was] no flight of thought, looseness of association, thought blocking or distractability." (AR 722). Dr. Bagner concluded that Plaintiff "would have mild limitations interacting with supervisors, peers and the public, maintaining concentration and attention, completing simple tasks and completing complex tasks." (AR 723). Plaintiff would also experience moderate limitation handling ordinary stresses associated with employment due to depression, low motivation and anxiety. (Id.). Although these assessments suggest that Plaintiff in fact experienced mild to moderate cognitive limitations due to his depressive order, there is no evidentiary support for the extreme and disabling mental impairment that Plaintiff has alleged. The ALJ's RFC clearly takes into account Plaintiff's mental limitations to the extent it limits him to simple tasks in low-stress, semi-isolated work environments. (AR 420).

1        Second, the testimony of VE Frank Corso supported the ALJ's
2   determination that there were jobs in significant numbers in the
3   national economy that Plaintiff could perform considering his
4   age, education, work experience and RFC.   An ALJ may properly
5   rely on the testimony of a VE where the ALJ poses a hypothetical
6   "contain[ing] all the limitations the ALJ found credible and
7   supported by substantial evidence in the record."   Bayliss v.
8   Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005).   Moreover, an ALJ
9   may rely on a VE's testimony regarding the number of relevant
10  jobs in the national economy, as "[a]n ALJ may take
11  administrative notice of any reliable job information, including
12  information provided by a VE."   Id. at 1218 (citing Johnson v.
13  Shalala, 60 F.3d 1428, 1435 (9th Cir. 1995).

14

15       Here, the ALJ asked the VE whether jobs existed in the
16  national economy for an individual with Plaintiff's age,
17  education, work experience and RFC.   (AR 452-57).   Moreover, the
18  ALJ confirmed that the VE had access to the medical records in
19  Plaintiff's case and was present for Plaintiff's testimony
20  regarding his symptoms.   (AR 452-53).   The VE testified that an
21  individual sharing Plaintiff's age, education, experience and
22  limitations would be able to perform work as a document preparer
23  at the sedentary level of physical exertion, a final assembler at
24  the sedentary level of physical exertion, and a sorter at the
25  sedentary level of physical exertion.   (AR 454-55).   He also
26  testified these jobs existed in significant numbers in the
27  national economy and in Plaintiff's local economy, and he
28  provided specific job numbers for each occupation.   (Id.).   The

ALJ asked the VE whether jobs would exist in significant numbers in the national economy for a person with the additional limitation of not being able to perform work in a loud environment. (AR 455). The VE testified that a person with this additional limitation would not be able to work as a sorter, but would still be able to perform work as a document preparer or final assembler. (Id.). Accordingly, even if substantial evidence supported including this additional limitation in Plaintiff's RFC, the ALJ's failure to do so was harmless error because Plaintiff could still perform work as a document preparer or final assembler.

In sum, based on the foregoing, there was substantial evidence supporting the ALJ's non-disability finding in this case. No remand is necessary.

\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\

**VIII.**

**CONCLUSION**

Consistent with the foregoing, IT IS ORDERED that Judgment be entered AFFIRMING the decision of the Commissioner. The Clerk of the Court shall serve copies of this Order and the Judgment on counsel for both parties.

DATED:  April 25, 2014

                                        /S/
                            SUZANNE H. SEGAL
                            UNITED STATES MAGISTRATE JUDGE